IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 2, 2018

**IN RE CHARLES T.[1]**

**Appeal from the Juvenile Court for Montgomery County**
**No. 17-JV-1527      Wayne C. Shelton, Judge**

---

**No. M2017-02545-COA-R3-PT**

---

This appeal arises from the juvenile court's ruling terminating the father's parental rights to his son on the grounds of abandonment by failure to visit, failure to support, and wanton disregard; substantial non-compliance with the permanency plan; and failure to manifest an ability and willingness to personally assume responsibility. The court further determined that termination of the father's parental rights was in the child's best interest. The father appeals. We affirm as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed as Modified; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S. and BRANDON O. GIBSON, J., joined.

M. Tyler Howard, Clarksville, Tennessee, for the appellant, Charles Raymond B.

Herbert H. Slatery, III, Attorney General and Reporter, and Brian A. Pierce, Assistant Attorney General, Nashville, Tennessee for the appellee, Tennessee Department of Children's Services.

Brian E. Price, Clarksville, Tennessee, Guardian ad litem.

**OPINION**

**I. BACKGROUND**

Charles T. ("the Child") was born to Cynthia Erin T. ("Mother") on August 24, 2016, in Davidson County, Tennessee. The Child suffered from drug exposure by

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

- 1 -

Mother during the pregnancy. At the time of the Child's birth, both parents were incarcerated. Charles Raymond B. ("Father") is not listed as such on the birth certificate of the Child, but paternity was established through DNA testing facilitated by the Tennessee Department of Children's Services ("DCS").

On August 31, 2016, DCS initiated an emergency protective custody order to place the Child in its custody. The Child has been in foster care continuously since that date. The juvenile court adjudicated the Child dependent and neglected on December 9, 2016. For a time, he was placed in the care of the paternal grandmother. However, DCS determined that the Child needed to return to DCS custody two-thirds of the way through the 90-day trial home visit due to a violation of the rules of placement.

Father was released from incarceration in October 2016 and a permanency plan was put into effect on November 17, 2016. Father was required, inter alia, to submit to an alcohol and drug assessment and follow all recommendations, demonstrate an ability to remain sober, resolve pending legal issues, adhere to the guidelines of his probation, obtain safe and stable housing, obtain a legal means of income, undergo a psychological evaluation and parenting assessment, and follow the recommendations of these assessments. Father was required to satisfy the requirements of the permanency plan by March 21, 2017.

After the Child was removed from the paternal grandmother and placed into a second foster home, Father stopped visiting the Child. From March 9, 2017, to October 2017, Father did not visit the Child at all. Father claims the reason for not visiting was because he relapsed and was using drugs.[2] According to Father, he "did not want to be around his son in a non-sober state."

Father did not pay any child support for the Child from May 2017 to September 2017. In September 2017, Father was arrested on aggravated burglary charges. After his release on bond, Father violated his probation and was jailed. The petition to terminate parental rights was filed on October 10, 2017. At the time of the trial on December 4, 2017, Father remained in jail on the probation violation and testified by telephone.

The juvenile court entered a written order terminating Father's and Mother's rights to the Child on March 6, 2018. Father filed this timely appeal.[3]

---

[2] In March 2017, Father appeared at a hearing seemingly under the influence of drugs. A drug screen revealed the presence of methamphetamine, opiates, cocaine, and THC.

[3] Mother failed to appear for the trial and did not file an appeal.

## II. ISSUES

We consolidate and review the issues raised on appeal by Father as follows:

A.      Whether clear and convincing evidence supports the court's termination of Father's parental rights based upon a finding of abandonment for failure to visit pursuant to Tennessee Code Annotated section 36–1–113(g)(1).

B.      Whether clear and convincing evidence supports the court's termination of Father's parental rights based upon a finding of abandonment for failure to support pursuant to Tennessee Code Annotated section 36–1–113(g)(1).

C.      Whether clear and convincing evidence supports the court's termination of Father's parental rights based upon a finding of substantial noncompliance with the permanency plan pursuant to Tennessee Code Annotated section 36–1–113(g)(2).

D.      Whether clear and convincing evidence supports the court's termination of Father's parental rights based upon a finding of abandonment for failure to assume custody or financial responsibility pursuant to Tennessee Code Annotated section 36–1–113(g)(14).

E.      Whether clear and convincing evidence supports the court's finding that termination of Father's parental rights was in the best interest of the Child pursuant to Tennessee Code Annotated section 36–1–113(i).


## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). The right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (*quoting* Tennessee Code Annotated Section 36–1–113(I)(1)). "'[F]ew consequences of judicial actions are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (*quoting Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (internal citations omitted).

According to Tennessee Code Annotated section 36–1–113(c), termination of parental rights is appropriate by the trial courts where there is clear and convincing evidence that statutory grounds exist for termination and termination is in the best interest of the Child. The clear and convincing evidence "serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998); *see also In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). This heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.C.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.* at 622 (Tenn. Ct. App. 1998). This court will review the juvenile court's specific finding of facts *de novo* from the juvenile court's trial records without the presumption of correctness. Tenn. R. App. P. 13(d); *see In re Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). After reviewing the facts, this court will then find whether clear and convincing evidence exists to prove that there was a statutory ground and in the Child's best interest to terminate Father's parental rights. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *see also In re F.F.R.*, 193 S.W.3d 528, 530 (Tenn. 2006). The juvenile court found multiple statutory violations that warranted the decision of Father's termination of parental rights to the Child. However, the trial court is required to find *only one statutory ground* for termination of parental rights, and DCS does not need to prove every statutory ground presented. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *see also In re C.C.W.* at 473 (Tenn. Ct. App. 2000) [citations added]. However, if the trial court did not address each ground presented in the issuance of its final order, this court will remand the case for findings on alternative grounds. *D.L.B*, 118 S.W.3d 367

(Tenn. 2003). In regard to terminating parental rights due to the Child's best interest, "there must be a showing that the parent is unfit or that substantial harm to the Child will result if parental rights are not terminated," and each parent is assessed individually in regards to being unfit. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

## IV. DISCUSSION

### A.

Under Tennessee law, a parent's parental rights may be terminated if the parent is incarcerated when a petition to terminate parental rights due to abandonment of the child is filed, or has been incarcerated during all or part of the four months immediately preceding the filing of the petition, and either has willfully failed to visit or support or make reasonable payments toward the support of the child for four consecutive months immediately preceding the parent's incarceration, or the parent has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child. Tenn. Code Ann. §§ 36–1–113(g)(1) and 36–1–102(1)(A)(iv).

Father had been incarcerated for two months at the time the petition to terminate was filed. Therefore, the relevant period of consideration is from May 2017 through September 2017, the date his incarceration occurred.

Abandonment by failing to visit occurs when a parent willfully fails to visit a child for at least four consecutive months immediately preceding the filing of the petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(iv). Failure to visit a child is willful when a person: 1) is aware of his duty to visit; 2) has the *capacity* to visit; 3) makes no attempt to visit; *and* 4) has no justifiable excuse for not visiting. *In re Audrey S.*, 182 S.W.3d 838, 863–64 (Tenn. Ct. App. 2005) (emphasis added). Willfully is defined as "voluntary and intentional, but not necessarily malicious. *Black's Law Dictionary*, 1593 (7th ed.).

Father contends that he failed to visit because he had relapsed and was using drugs. Father testified that he did not want to be around the Child during that time. However, a parent's choice to continue to use drugs constitutes willful failure to visit a child. *See In re Morgan S.,* 2010 WL 520972, Further, as a matter of law, "[p]ersons are presumed to know the law, and parents should know that they have a responsibility to visit their children." *In re M.L.P.,* 281 S.W.3d 387, 392 (2009).

As noted by the trial court:

In the four months preceding his incarceration, [Father] did not visit with the [C]hild at all. [Father] was not incapacitated in any way during the four

- 5 -

month period preceding his incarceration that would have prevented him from visiting the [C]hild. [Father] admitted he knew the [C]hild was in custody, admitted that he knew how to go about setting up visitation with the [C]hild, and admitted that he knew he was required to visit. [Father] admitted to having no visitation with the [C]hild from March 2017 until he became incarcerated in September 2017.

Father was aware of his duty to visit. When the permanency plan was put into place by DCS, Father regularly visited the Child on the weekends at the home of the Child's biological grandmother. Father did not stop visiting the Child until March 9, 2017. Father acknowledges that he received a copy of the Criteria for Termination of Parental Rights. The record reveals that the trial court properly found that Father had willfully not visited the Child in the four month period prior to his incarceration.

### B.

Tennessee Code Annotated section 36-1-113(g)(1) provides that parental rights may be terminated where an incarcerated parent abandons a child by engaging in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). To prove this ground, DCS must establish that Father: (1) was incarcerated at the time the termination petition was filed or within the preceding four month period; and (2) engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. Tenn. Code Ann. § 36-1-102(1)(A)(iv); *In re Kason C.*, No. M2013-02624-COA-R3-PT, 2014 WL 2768003, *5 (Tenn. Ct. App. June 17, 2014). Parental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration. *State of Tenn., Dep't. of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009).

We have held on numerous occasions that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68.

Father has been incarcerated within four months of the petition to terminate being filed. As noted by the State, the Montgomery County incarceration stemmed from a charge of aggravated burglary that had not been resolved at the time of the juvenile court trial. The Dickson County incarceration related to a probation violation from an earlier felony charge in 2011. Prior to that incarceration, in 2016, Father served additional time in Dickson County for another probation violation.

The State contends that Father's persistent drug use following his release from jail in 2016 demonstrates his wanton disregard for the health and welfare of the Child. According to Father, he has a drug problem and has "been on every drug." His "more recent drug of choice" has been opiates.

As observed by the trial court, Father engaged in drug abuse and criminal activities "rather than making progress towards reunifying with his [C]hild." The record supports the trial court's determination that Father's conduct evidences wanton disregard for the well-being of the Child and constitutes grounds to terminate his parental rights.

C.

Pursuant to Tennessee law, a parent's parental rights may be terminated if the parent is incarcerated when a petition to terminate parental rights due to abandonment of the child is filed, or has been incarcerated during all or part of the four months immediately preceding the filing of the petition, and has willfully failed to make reasonable payments toward the support of the child for four consecutive months immediately preceding the parent's incarceration. Tenn. Code Ann. § 36-1-113(g)(1) and 36-1-102(1)(A)(iv).

"Defining abandonment as the mere non-payment of support, irrespective of intent, would be unconstitutional." *See In re D.L.B.*, 118 S.W.3d 360, 367. To provide token support, a parent must rely on both income and available resources for the payment of debt. *Black's Law Dictionary*, 1070 (9th ed. 2009). A parent is not considered to have abandoned a child "when the failure to support is outside of their control." *In re Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). The evidence of parent's income and expenses is significant when the ground of abandonment by willful failure to support is alleged. *In re Nevada N.*, 498 S.W.3d 579, 594 (Tenn. Ct. App. 2016); *see generally In re Angela E.*, 402 S.W.3d at 641 (Tenn. 2013). DCS must "prove by clear and convincing evidence that the Father had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *In re Angela E.* at 641.

Father testified that he was paying some child support to the paternal grandmother when the Child was in her custody, but no money was paid to the Division of Child Support. Father did not pay any support during the relevant statutory period. According to Father, between May and September, he lost his job and became homeless. Father noted in his testimony that he did not financially support the Child:

Q. Okay. Were you working during that time period?

A. No, I was not. I was – I was also homeless during that time period.

Q. Okay. How were you supporting your drug habit during that time period?

A. I was panhandling. I was – I would like – the people – I would hop at their houses and stuff, they were drug addicts and stuff. Like I would – I had, quote, unquote, addict friends who kind of helped support my habit. Actually, completely helped support my habit.

The caseworker assigned to this matter testified that Father reported being homeless to DCS.

The trial court determined that Father "was not incapacitated . . . during the four month period preceding his incarceration that would have prevented him from supporting the [C]hild." The court found that Father "reported that he was not working during this time period, purchasing drugs instead of working and supporting" the Child. Father has previously appeared in court under the influence of drugs of methamphetamine, opiates, cocaine, and THC.

The trial court further held "that [Father] was capable of working and reported that he was previously employed as a professional trim carpenter." According to the court:

> [Father] reported that he had been working for the same employer on and off since 2011. [Father] testified that in this capacity he made approximately $1,400 a month. [Father] testified that the following were his expenses during this time period: $400 month in rent; $160 a month for gas; and $200[4] a month for his phone bill. After his monthly expenses, [Father] had approximately $640 left for his personal needs and support of the [C]hild. However, [Father] testified that he only paid any support towards the care of the [C]hild while the [C]hild was in the home of his mother who was a DCS foster care kinship placement. After the [C]hild was placed in a DCS foster home . . ., [Father] admitted that he provided no support towards the [C]hild in the period of time preceding his incarceration.
>
> After the [C]hild came into DCS custody, DCS did explain to the father that a failure to support the [C]hild could result in a termination of his parental rights. The father was ordered to

---

[4] Father stated $50/month for the phone.

provide support towards the care of the child while he was in foster care. The father knew his [C]hild was in DCS custody and that failure to support his [C]hild could result in a termination of his parental rights. [Father] knew of his duty to support and the consequences of his failure to do so because he signed the Criteria and Procedures for Termination of Parental Rights which were explained to him by DCS staff. Additionally, the father was provided copies of the [C]hild's permanency plans which outlined his duty to support the [C]hild. Despite this knowledge [Father] has never supported his [C]hild since he entered DCS custody.

Although the record reveals support for the determination of the trial court that Father knew of his duty to support the Child and the consequences of his failure to do so, we find the evidence insufficient to establish Father's ability to remit support during the relevant time period. We accordingly reverse on this ground.

D.

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37–2–403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36–1–113(g)(2). To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 149 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002–02235–COA–R3–JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *Id.* at *12. Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548–49.

In the case at bar, the permanency plan required Father to (1) make payments of $50 per month towards the care of the Child; (2) resolve pending legal issues and adhere to any rules or guidelines of their probation; (3) maintain regular contact with DCS; participate in all meetings and court hearings regarding the Child; (4) Father establish paternity through DNA testing; (5) maintain sobriety; (6) complete an alcohol and drug assessment, following all recommendations thereof; (7) obtain and maintain stable and appropriate housing; (8) obtain and maintain a legal source of income, providing proof of said source of income to DCS; (9) complete a psychological evaluation to include a domestic violence component; (10) complete a parenting assessment, following all recommendations thereof; (11) sign releases of information to allow DCS to obtain records from all assessments and services; and (12) maintain regular visitation with the Child.

The only tasks that Father completed were DNA testing which confirmed his paternity to the Child and an alcohol and drug assessment. The State contends that Father did not regularly pay child support. He did not resolve his legal issues and adhere to the requirements of his probation, as evidenced by his incarceration on probation violations. Father also picked up additional burglary charges in Montgomery County. Father admitted that he did not participate in meetings or court hearings regarding the Child. He did not complete the psychological assessment. He did not complete a parenting assessment. Father did not maintain stable housing suitable for the Child, as he had returned to jail and was otherwise homeless at the time of trial. Despite completing an alcohol and drug assessment, he asserted that he could not complete a recommended intensive outpatient therapy program due to a lack of funding. Father admitted abusing drugs for at least six years and to continuing drug problems at the time of the trial. Father did not complete any other requirement on this plan. Even though Father struggled with his own personal problems, DCS provided help as much as possible for Father to follow the permanency plan. All of these requirements, considering Father's circumstances, were reasonable and necessary to establish permanency with the Child.

Father appears to assert that DCS failed to offer reasonable efforts to assist him in completing the permanency plan. However, in *In re Kaliyah S.,* 455 S.W.3d 533, 535 (Tenn. 2015), the Tennessee Supreme Court held that "in a termination proceeding, the extent of the efforts made by the State is weighed in the court's best interest analysis, but the State need not prove that it made reasonable efforts as an essential component of its petition to terminate parental rights." Further, DCS did attempt to assist Father in completing the recommendations of the alcohol and drug assessment, attempted to set appointments with him, tried to communicate with him via letter to his address of record, and paid for his clinical assessment. Father, however, failed to avail himself of the proffered assistance.

Father has admittedly failed to comply with most of the permanency plan's requirements. We conclude that there was clear and convincing evidence to establish that Father failed to substantially comply with the requirements of the permanency plan.

E.

Parent's parental rights may be terminated if parent has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Tenn. Code Ann. § 36–1–113(g)(14).

Father has failed to show an ability and willingness to personally assume legal and physical custody of the Child. He has failed to address his legal issues and his drug addiction. He acknowledges the need to complete drug rehabilitation and the fact that the Child would have no home. He admits that he was given 18 months to demonstrate an ability and willingness to parent the Child and that he failed to accomplish the task.

Father has had no contact with the Child since March 2017. He has no relationship with the Child whatsoever. The Child would be at risk of substantial harm to his physical or psychological welfare if placed in Father's custody. Father has a history of drug abuse with a variety of drugs, including highly addictive opioids. Father has not shown evidence of his ability to resolve his drug problems or any willingness or ability to parent the Child.

The Father's ability to assume legal and physical custody of the Child is extremely questionable. Father's drug habits, Father's homeless situation, and Father's incarceration would make it near impossible for the Child to be raised without a risk of substantial harm to the Child. The court also takes into consideration the current health of the Child. The Child was born drug exposed and has suffered ongoing medical issues because of the illness. Ms. Sauda testified that Child has been sick many times that required frequent visits to the doctor.[5]

The evidence of record supports the determination of the trial court on this statutory ground.

---

[5] The reasons the Child was visiting the doctor were bronchial issues, ear infections, and viral infections.

## F.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground to terminate Father's parental rights, we must consider whether termination was in the best interest of the Child. In making this determination, we are guided by the following non-exhaustive list of factors:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child … the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;[6]

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional, or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

---

[6] *In re Kaliyah S.*, 455 S.W.3d at 555 ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

(8)   Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)   Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36–5–101.

Tenn. Code Ann. § 36–1–113(i).   "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).   The General Assembly has also stated that "when the best interest of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest of the child, which interests are hereby recognized as constitutionally protected."   Tenn. Code Ann. § 36–1–101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (*holding* that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

The juvenile court found that terminating Father's parental rights was in the Child's best interest.   The record confirms that Father has not made an adjustment of circumstance, conduct, or conditions that would make it safe and in the Child's best interest to be in his home.   Tenn. Code Ann. § 36-1-113(i)(1).   Father has been unable to establish a suitable home because he has been incarcerated and continued to use drugs while the Child has been in DCS's custody.   Father failed to participate in the recommended treatment and was incarcerated at the time of trial.   This factor weighs in favor of terminating Father's parental rights.

Father has not visited or provided support for the Child.   Tenn. Code Ann. § 36-1-113(i)(3) & (9).   Father had not seen or spoken to the Child for over six months preceding the trial in the juvenile court.   He made no efforts to seek visitation.   He made no payments to DCS to support the Child.   Father was aware of his obligations to visit and provide for the Child and failed to do so.   These factors weigh in favor of termination of Father's rights.

Father has not established a meaningful relationship with the Child.   Tenn. Code Ann. § 36-1-113(i)(4).   At the time of trial, the Child was just over two years old.   The Child has been in DCS custody his entire life, and Father had only visited on a few occasions between January and March 2017.   Father admitted he did not have a relationship with the Child.   Thus, this factor also weighs in favor of termination.

A change of caretakers and physical environment would likely have a negative effect on the Child. Tenn. Code Ann. § 36-1-113(i)(5). His foster parents report that he is happy and thriving in their home. The Child is bonded with the foster parents, who are teaching him sign language and have taught him to walk. The DCS case worker confirmed the bond through her own observation. The Child also receives daycare services from DCS and a therapist visits several times per week. The foster parents love the Child and intend to adopt him if given the opportunity. Father, on the other hand, has no relationship with the Child and has not demonstrated any ability to care for the Child on a daily basis. This factor weighs in favor of termination.

The evidence of record supports the determination that termination of Father's parental rights is in the Child's best interest.

## V. CONCLUSION

The judgment of the trial court is affirmed as modified, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Charles Raymond B.

_____
JOHN W. McCLARTY, JUDGE